UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DANIEL FERRARIO, | ) |
| Plaintiff, | ) ) ) ) |
| vs. | ) Case No. 4:20-CV-00638-SEP ) |
| KILOLO KIJAKAZI,[1] | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of Social Security, denying the application of Plaintiff Daniel Ferrario for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*.  Because there is substantial evidence to support the decision, the Court will affirm Defendant's denial of Plaintiff's application.

**I.   BACKGROUND**

On October 3, 2017, Plaintiff applied for DIB and SSI, alleging that he had been unable to work due to disability since July 31, 2017.  (Tr. 162-72).  He alleged disability based on anxiety, depression, and bipolar disorder.  (Tr. 172).  His applications were initially denied on December 1, 2017.  (Tr. 93-98).  Plaintiff subsequently filed a Request for Hearing by Administrative Law Judge (ALJ), and a hearing was held on April 9, 2019.  (Tr. 28-70).

Plaintiff, who was represented by counsel, represented at his hearing that he was unable to work due to symptoms caused by anxiety, depression, and bipolar disorder.  (Tr. 35).  He testified that he lived alone in his own apartment.  (Tr. 37).  He testified that he was able to drive, but did not own a car, and he was able to get around by using the transportation provided by Harmony House Clubhouse.  (Tr. 39).  He further testified that he had been terminated from his

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted as Defendant in this case.  No further action is needed for this action to continue.  *See* 42 U.S.C. § 405(g) (last sentence).

previous job as a facilities manager at a YMCA in Texas because he was so anxious and forgetful that he had difficulty meeting deadlines, focusing on required tasks, and supervising employees who reported to him.  (Tr. 40).  He testified that, at the time of the hearing, he was working three five-hour shifts per week at a food pantry, where he helped fill boxes with food for pickup by customers, and that he had an easier time concentrating and completing tasks because the facility had displays that showed him what to put in each box.  (Tr. 38-40, 45).  He testified that he sometimes has a hard time getting out of bed, but he forces himself to do so, and is able to walk his dog, shower and get ready, prepare his own meals, run errands, and clean his apartment.  (Tr. 47, 49).

In his Adult Function Report, Plaintiff states that on a typical day he showers, attends support groups, takes his medicine, and eats two meals per day.  (Tr. 211).  He states that he has no problems with personal care and does not require any assistance from others with respect to self-care, including taking his medications.  *Id*.  He further states that he is able to perform household chores and yardwork.  (Tr. 212).  He states that he is able to go out alone, and while he can drive, he generally either walks or takes public transportation when he needs to travel.  (Tr. 213).  He also states that he can follow written and verbal instructions "fairly well, except when [he] is symptomatic," and that he has "no problems" getting along with authority figures.  (Tr. 215).

In an opinion issued on June 12, 2019, the ALJ found Plaintiff was not under a "disability" as defined in the Act.  (Tr. 14).  Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's (SSA) Appeals Council.  (Tr. 157-59).  On April 24, 2020, the SSA's Appeals Council denied his Request for Review.  (Tr. 2-4).  Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

As to further evidence of record, the Court accepts the facts as provided by the parties and will address specific facts related to the issues raised by the parties as needed in the discussion below.

**II.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT**

To be eligible for benefits under the Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines as disabled a person who is unable

"to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a);[2] *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" (RFC), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648

---

[2]  All references are to the version of the regulations that was in effect as of the date of the ALJ's decision.

3

F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if he cannot make such an adjustment, he will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

### III.   THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date, July 31, 2017; that Plaintiff has the severe impairments of bipolar disorder, major depressive disorder, and generalized anxiety disorder; and that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 13).  The ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:  he can attend to and carry out routine and repetitive tasks, but not as a production rate pace (e.g., assembly line work); he can occasionally interact with the public and coworkers; may have only superficial interaction with others; is not able to engage in tandem tasks, and is not able to perform tasks involving arbitration, negotiation, conflict resolution, management of the work of others, or responsibility for the safety and welfare of others; and is limited to positions with infrequent changes in an otherwise static work environment.  (Tr. 14).

The ALJ found that Plaintiff is unable to perform any of his past relevant work.  (Tr. 19). But considering Plaintiff's age, education, and work experience, and in reliance on the testimony of a vocational expert (VE), the ALJ found that Plaintiff would be able to perform occupations including industrial cleaner (Dictionary of Occupational Titles (DOT) No. 381.687-018, medium exertional level), dishwasher (DOT No. 318.687-010, medium exertional level); and housekeeping cleaner (DOT No. 323.687-014, light exertional level).  (Tr. 20).  The ALJ

4

concluded, therefore, that Plaintiff was not disabled as defined by the Act from the alleged onset date through June 12, 2019, the date of the decision.  (Tr. 20).

## IV.   STANDARD FOR JUDICIAL REVIEW

This Court must affirm the Commissioner's decision if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942.  *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the Court considers both evidence that supports that decision and evidence that detracts from that decision.  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012).  However, the Court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  A reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" supported by the evidence of record. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2010).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. *Id*.  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

V.     **DISCUSSION**

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ was unreasonable in relying on the testimony of the vocational expert; and (2) the ALJ did not properly weigh the opinion of Plaintiff's treating psychiatrist, Dr. Bhaskar Gowda. In response, the Commissioner maintains that the ALJ properly evaluated the medical opinions of record and based his decision on substantial evidence in the record as a whole.

### A. Whether the ALJ Erred at Step Five in Relying on VE's Testimony

At Step Five, it is the Commissioner's burden to "identify the types of jobs [a claimant] could perform notwithstanding his disabilities" and to "ascertain whether those kinds of jobs 'existed in significant numbers in the national economy.' " *Biestek*, 139 S. Ct. at 1152 (quoting 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1); *see also Pearsall*, 274 F.3d at 1219. "For guidance on such questions, ALJs often seek the views of 'vocational experts.'" *Biestek*, 139 S. Ct. at 1152. Vocational experts "are professionals under contract with [the Social Security Administration] to provide impartial testimony in agency proceedings." *Id.* "They must have 'expertise' and 'current knowledge' of '[w]orking conditions and physical demands of various' jobs; '[k]nowledge of the existence and numbers of [those jobs] in the national economy'; and '[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs.'" *Id.* (quoting SSA, Hearings, Appeals, and Litigation Law Manual I-2-5-50 (Aug. 29, 2014)). "Many vocational experts simultaneously work in the private sector locating employment for persons with disabilities." *Id.* "When offering testimony, the experts may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'" *Id.* at 1152-53 (quoting Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *2).

It is well established in the Eighth Circuit that "[t]he Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Williams v. Saul*, 2020 WL 5569992, at *5 (E.D. Mo. Sept. 17, 2020) (quoting *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005)). However, there are some limitations on the ALJ's ability to rely on VE testimony. For example, "when a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Buckner v. Astrue*, 646 F.3d at 561 (internal quotation marks omitted); *see also Collins v. Astrue*,

6

648 F.3d 869, 872 (8th Cir. 2011) ("Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.") (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)).  There is no dispute in the instant case that the questions posed to the VE were based on correctly phrased hypothetical limitations.  Rather, Plaintiff argues that the ALJ erred at Step Five by relying on the VE's testimony because it was of dubious reliability.

Plaintiff cites certain factors that he maintains undercut the reliability of the VE's testimony.  First, Plaintiff argues that it was improper to rely on the testimony of the VE because the record contains no curriculum vitae documenting the VE's qualifications and experience.  Second, Plaintiff argues that one source of the VE's job availability data, Employment Statistics Quarterly published by United Stat Publishing Company (U.S. Publishing) was unreliable, because it includes data about both full-time and part-time work in its census data.  For the reasons discussed below, these arguments do not warrant reversal.

Plaintiff cites to no authority for the proposition that a VE's qualifications, as established by a curriculum vitae, must be included in the record.  The Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) does state that an ALJ will "admit into the record a written statement or resume of the [vocational expert's] qualifications." *See* Soc. Sec. Admin., HALLEX 1-2-1-31, https://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-31.html. However, the Eighth Circuit has clearly established that the HALLEX "has no legal force" and "does not bind the SSA." *Dols v. Saul*, 931 F.3d 741, 749 n.4 (8th Cir. 2019) (quoting *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam)).

In any event, Plaintiff did not cite to the HALLEX, and points the Court to no other authority that may support his argument.  The Court's own research has not revealed any Eighth Circuit cases addressing the issue, and other courts considering this question have held that the absence from the record of a VE's curriculum vitae or other written statement of qualifications does not warrant reversal of the ALJ's decision. *See Carter v. Commissioner of Social Security*, 2014 WL 4987419, at *9, (S.D. Ohio Oct. 6, 2014) (Where the "plaintiff had the opportunity at the administrative hearing to inquire into the vocational expert's qualifications but failed to do so . . . plaintiff will not now be heard to challenge the Commissioner's decision on this basis."); *Haskins v. Commissioner of Social Security,* 2008 WL 5113781, at *16, (N.D. NY Sept. 11, 2008) (declining to reverse the ALJ's decision even though "the VE's qualifications are absent

from the record" where the record "nonetheless reveals that plaintiff's counsel was given the opportunity to question the VE following her answers to the ALJ's questions but declined to do so," and "failed to object to her qualifications" during or after the hearing).

Plaintiff's counsel had access to the record both before and after the hearing. As in *Carter* and *Haskins*, Plaintiff here raised no objection to the record with respect to this issue at the administrative hearing, nor in his post-hearing objections filed with the Appeals Council. (Tr. 28-70, 250-256). Furthermore, Plaintiff's counsel thoroughly cross-examined the VE regarding other concerns but did not make a single inquiry into his qualifications. Indeed, at the hearing the ALJ explicitly asked Plaintiff's counsel whether he had "any questions regarding [the VE's] professional qualifications," and Plaintiff's counsel replied, "No, Your Honor." (Tr. 56-57). Additionally, Plaintiff's counsel could have, but did not, object to the VE testifying as an expert at the hearing. *See Haskins*, 2008 WL 5113781, at *16, ("Plaintiff's failure to raise this issue before the ALJ effectively waived any challenge to the VE's qualifications.").

Moreover, even though the VE's curriculum vitae was missing from the record, the VE in this case, Dr. Darryl Taylor, has extensive experience serving as a VE in SSA proceedings in this jurisdiction, having performed that role for over a decade. It is reasonable to presume that both the ALJ and Plaintiff's counsel were familiar with him and aware of his qualifications. *See Hanauer v. Astrue*, 2010 WL 1687809 (E.D. Mo. Apr. 7, 2010) (Vocational Expert Dr. Darryl Taylor testified at the hearing); *Harris v. Astrue*, 2012 WL 4470388 (E.D. Mo. Sept. 27, 2012) (same); *Brown v. Colvin*, 2015 WL 4168203 (E.D. Mo. July 9, 2015) (same); *Horton v. Berryhill*, 2019 WL  1317458 (E.D. Mo. April 7, 2010) (same). Even though it is preferable that a VE's qualifications be entered into the record, under the circumstances of this case, the omission was harmless error, as it does not undermine the ALJ's Step Five findings. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (holding an error harmless where "[t]here is no indication that the ALJ would have decided differently" had the error not occurred) (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)).

Second, Plaintiff argues that the VE's testimony did not constitute substantial evidence because one of the sources on which he relied—U.S. Publishing—contained data about both part-time and full-time jobs. Plaintiff also asserts that the source was unreliable because it had been administratively dissolved by the State of Missouri for failure to file a registration report.

As noted above, at Step Five the burden of proof lies with the Acting Commissioner to show that appropriate work exists in significant numbers either in the region where the claimant lives or in several regions of the country.  *See* 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Moore*, 572 F.3d at 523.  The Social Security Act states that an individual is disabled:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B).

The regulations further provide that the Acting Commissioner will take administrative notice of job data obtained from certain specified publications, including the DOT.  20 C.F.R. § 404.1566(d).  However, the ALJ is not restricted to considering only jobs data derived from these specified sources.  Rather, the VE, when offering testimony, may invoke not only other "publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own "experience in job placement or career counseling.'"  *Biestek*, 139 S. Ct. at 1152-53 (quoting SSR 00-4p, 2000 WL 1898704, at *2).

Here, the VE relied on data from one such publicly available source, U.S. Publishing, which includes part-time work in its census data regarding the types and numbers of jobs available in the national economy.  *See* https://www.uspublishing.net/references.html (last visited August 15, 2021).  Plaintiff contends that the ALJ could consider only full-time jobs when determining whether there were a significant number of jobs in the economy that Plaintiff could perform, and thus the ALJ erred in relying on the VE's testimony, because it was based on data that included part-time positions.  In support of his argument, Plaintiff points to Social Security Ruling 96-8p, which provides that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

SSR 96-8p does not apply to the VE's testimony, however, but rather to the ALJ's functional capacity determination.  Therefore, on its face it cannot be interpreted to mean that a

9

VE may permissibly testify only as to availability of full-time jobs. In *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014), the Eighth Circuit considered a case where the social security claimant argued that the ALJ erred in relying on the VE's testimony because the VE admitted that some of the available jobs he testified were available were "part-time rather than full-time positions, whereas the RFC determination is based on a person's ability to work on a regular and continuing basis, meaning eight hours a day, five days a week." The Eighth Circuit rejected the claimant's argument, holding that the VE was not "required to articulate the percentage of available jobs that were part-time or full-time." *Id*. Other circuits that have considered this issue have reached a similar conclusion. *See Liskowitz v. Astrue*, 559 F.3d 736, 745 (7th Cir. 2009) ("there is no per se rule that part-time work cannot constitute substantial activity") (quoting *Kelley v. Apfel*, 185 F3d 1211, 1214-15 (11th Cir. 1999)). As the court in *Liskowitz* explained, "to say that the ALJ may deny benefits only if she finds the claimant capable of some form of full-time work is quite different from saying that only full-time jobs can constitute significant work in the national economy." *Id*.

As for whether U.S. Publishing is generally a reliable source for job data, Plaintiff cites no authority for the claim that its registration status with the State of Missouri undermines its reliability. And other courts have found that U.S. Publishing is "a proper source for job number testimony." *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993); *Offield v. Colvin*, 2016 WL 223716, at *13 (W.D. Mo. Jan. 19, 2016) ("Employment Statistics Quarterly published by United Stat Publishing Company 'does indeed seem to be a source on which VEs customarily rely.' ") (quoting *Liskowitz*, 559 F.3d at 743-44).

Accordingly, the Court finds that the VE's testimony about the number of jobs a person with Plaintiff's RFC could perform constituted substantial evidence on which the ALJ reasonably relied. The Acting Commissioner met her burden at Step Five of showing that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.

**B. Weighing the Opinion of Plaintiff's Psychiatrist**

Plaintiff's treating psychiatrist, Dr. Gowda, appears to have seen Plaintiff twice between January 7, 2019, and April 18, 2019. (Tr. 1354-1373). Approximately one week after Plaintiff's administrative hearing before the ALJ, Dr. Gowda provided the ALJ with his opinion regarding Plaintiff's mental residual functioning capacity. (Tr. 1364-67). Dr. Gowda diagnosed Plaintiff with depression and anxiety, and, in a "check-the-box" list of symptoms, noted that Plaintiff's

signs and symptoms included appetite disturbance, loss of interest in activities, sleep disturbance, psychomotor agitation/retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide, persistent anxiety, motor tension, persistent irrational fear, and recurrent severe panic attacks. (Tr. 1364). In the section of the form asking Dr. Gowda to check a box indicating how Plaintiff's psychiatric state would impair his ability to work, Dr. Gowda opined that Plaintiff was "extremely" impaired in almost all areas,[3] including the ability to understand and carry out detailed instructions; to maintain attention; to keep a schedule; to work without special supervision; to work in proximity with or get along with others; to make simple decisions; to keep a consistent pace without unreasonable rest periods; to interact appropriately with the public; to accept instructions or criticism; to exhibit socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; to travel or use public transportation; or to set realistic goals and make plans. (Tr. 1365-66). Dr. Gowda also opined that Plaintiff showed "extreme" limitations in all activities of daily living and maintaining social functioning. (Tr. 1364). In the space provided for Dr. Gowda to include more detailed comments, he wrote, "Pt. has mood swings and anxiety. He is still not functioning well due to his symptoms. He is not able to function/capable of handling any kind of job at this juncture." (Tr. 1367).

Because Plaintiff filed his application after March 27, 2017, the new Social Security regulations regarding the evaluation of medical evidence apply to his case. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Under the new regulations, ALJs are no longer required to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. *Id.* §§ 404.1520c(a), 416.920c(a). The new regulation not only eliminated the treating physician rule, but also relaxed the requirement that ALJs provide "good reasons" for the weight given to medical opinions. *Compare* 20 C.F.R. § 404.1527 (old rule) *to* 20 C.F.R. § 404.1520c (new rule). Under the new rule, ALJs must determine the persuasiveness of each medical source or prior administrative medical finding based on supportability, consistency, relationship with the claimant, specialization, and any other factors that "tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520(a), (c). *See also* 20 C.F.R.

---

[3] "Extreme" impairment was the most severe level of impairment from which Dr. Gowda could choose on the form provided. The only area in which Dr. Gowda did not find Plaintiff to be "extremely" impaired was in the ability to understand and remember short, simple instructions. (Tr. 1365-66).

11

§§ 404.1520c(b)(2), 416.920c(b)(2) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative findings to be . . . . We may, but are not required to, explain how we considered the [other listed factors].").

Because the new regulations clearly eliminated the treating physician rule, the ALJ was not obligated to give any special weight to Dr. Gowda's report. In evaluating Dr. Gowda's opinion, the ALJ found the opinion unpersuasive because it was unsupported by and inconsistent with the evidence of record, stating:

> The undersigned . . . finds the mental medical source statement of Dr. Gowda, who determined [Plaintiff] has multiple extreme mental limitations, unpersuasive. The April 18, 2019, medical source statement is . . . the product of a pre-printed "check the block" form questionnaire. The opinion is unpersuasive because it does not articulate an objective medical basis for the extreme limitations indicated and is inconsistent with the physician's own unremarkable mental status examination findings, which was performed the same day Dr. Gowda completed the mental medical source statement. These findings were essentially normal except for loud speech and use of offensive language. Further, the opinion is unsupported by the unremarkable mental status examination findings of the other mental health source providers.

(Tr. 22) (internal citations removed). After careful review of the record, and for the reasons discussed below, the Court finds that the ALJ reasonably articulated why he found Dr. Gowda's opinion unpersuasive, and his finding falls within the available "zone of choice." *Buckner v. Astrue*, 646 F.3d at 556 (In weighing a treating source opinion, it is the ALJ's role to resolve conflicts in the evidence, and the ALJ's finding should not be disturbed so long as it falls within the "available zone of choice.").

Plaintiff first contends that the ALJ was inaccurate in finding that Dr. Gowda's opinion that Plaintiff is "extremely" or "markedly" limited in all areas of functionality was unpersuasive due to its lack of a sufficient "objective medical basis" for such extreme limitations. Doc. [22] at 12. Plaintiff points to the comments section of Dr. Gowda's opinion, in which he attributed Plaintiff's extreme limitations to his "mood swings and anxiety." *Id*. But such a generalized and vague description of Plaintiff's condition does not provide adequate support for fashioning a different RFC, and certainly does not negate the frequently unremarkable mental status examination findings of both Dr. Gowda and other mental health care providers.

For example, Dr. Gowda's treatment notes contain few objective findings or observations that would support the opinions offered. While Dr. Gowda did note that Plaintiff complained of mood swings and exhibited loud speech and offensive language during the April 18, 2019, office visit, at that same visit Dr. Gowda also noted that Plaintiff's "mood swings are better after starting him on Latuda." (Tr. 1369). Dr. Gowda went on to note that Plaintiff recently got a support dog and feels that the dog "helps him and calms him." (Tr. 1369). Dr. Gowda also noted that Plaintiff was cooperative, alert and well oriented, with good recent and remote memory. (Tr. 1371). Plaintiff was also noted to be well groomed and neatly shaven with overall good personal hygiene, normal psychomotor activity, and he exhibited a euthymic mood with appropriate affect. *Id*. Dr. Gowda further noted that Plaintiff denied any suicidal ideations or plans. (Tr. 1370).

At Plaintiff's only other examination by Dr. Gowda, approximately four months prior to the date of the opinion, Dr. Gowda noted that Plaintiff was taking his medications, reported no side effects, and felt that his medications were "working well." (Tr. 1355). Dr. Gowda noted that Plaintiff was "cooperative" with "good eye contact," "euthymic mood," and "appropriate affect." Plaintiff was noted to be alert, with "goal directed" thoughts, and no suicidal ideations or paranoia, and exhibited good memory. (Tr. 1357).

Furthermore, Dr. Gowda's opinion that Plaintiff "is not able to function/capable of handling any kind of job at this juncture" is not a medical finding for the ALJ's consideration; rather, it is a conclusion that should have been reserved to the ALJ. (Tr. 1367). *See* 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i) (issues reserved to the Commissioner include "statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work").

Moreover, Dr. Gowda's opinion itself was sparse, lacking in detail, and consisted of fill-in-the-blank answers, and one brief and conclusory written statement. RFC opinions that "consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses, . . . cite[ ] no medical evidence and provide little to no elaboration . . . possess 'little evidentiary value.'" *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (quoting *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)).

Additionally, the ALJ did not err in finding that Dr. Gowda's opinion was unpersuasive because it was inconsistent with and unsupported by the record as a whole. The ALJ noted that

13

Plaintiff's mental status examinations were generally unremarkable; he was able to live and function independently; he demonstrated the ability to work five hours per day, three days per week; and his symptoms seemed reasonably well-controlled by medication. (Tr. 16-18). The ALJ reasonably considered that the objective medical evidence provided by other health care providers did not support the extremely restrictive limitations indicated by Dr. Gowda. (Tr. 17-23). It was proper for the ALJ to consider the often normal and unremarkable mental findings in the record, including his generally moderate symptoms, normal mood, and rational thought processes, as well as the improvement of his symptoms with medication. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (mild or normal objective findings undermine allegations of disability); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000) (impairments that are controllable or amenable to treatment do not support a finding of total disability). It was also proper for the ALJ to find Plaintiff's activities of daily living to be inconsistent with the extreme limitations in Dr. Gowda's opinion. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (internal citation omitted) ("Working generally demonstrates an ability to perform a substantial gainful activity."); *see also Riggins v. Apfel,* 177 F.3d 689, 693 (8th Cir.1999) (finding activities such as driving, shopping, visiting his mother, watching television, and playing cards were inconsistent with plaintiff's allegations of total disability).

  For example, near the beginning of the onset period, Plaintiff had two brief episodes of inpatient care for his mental health conditions during the relevant period. In September 2017, Plaintiff had recently lost his job in Texas and returned to St. Louis, where he was originally from, and he was unhoused upon his arrival in Missouri. On September 14, 2017, Plaintiff presented to Mercy Hospital, where he complained of suicidal thoughts, and he was admitted to the hospital through September 18, 2017. During his hospitalization, while Plaintiff was noted to be depressed and anxious, he was also generally observed to be alert, well-oriented, and cooperative, with normal speech and coherent thought processes and no impulsivity, hallucinations, or mania. (Tr. 346-49, 351-52, 354, 356, 359, 364, 369, 371, 376-79, 383). One of Plaintiff's doctors initially observed that Plaintiff "is homeless and appears to be malingering for secondary gain of meds, housing, food." (Tr. 347). The doctor later noted that Plaintiff had been sleeping well, was "fairly comfortable and has no signs of distress," yet was "actively voice[ing] his suicidal thoughts," in an apparent effort to "seek hospital stay." (Tr. 379). The record indicates that Plaintiff "demonstrate[d] effective coping mechanisms and psychosocial

14

functioning throughout [his] hospitalization." (Tr. 356). On the date of Plaintiff's discharge, the record noted that it was "becoming apparent that the [patient] may be malingering the severity of his depression in order to gain more days of hospital stay because of his homelessness . . . I do not see much of objective signs for depression." (Tr. 383). Upon discharge on September 18, 2017, his mental status examination was generally unremarkable, indicating that he was calm, cooperative, with a stable mood, and his prognosis was noted to be "good." (Tr. 359).

On September 22, 2017, Plaintiff presented to St. Anthony's Hospital, again complaining of suicidal ideation. (Tr. 439). Upon admission to the hospital, his examination indicated that he was alert, well-oriented, with normal sensory function and no focal deficit, with a flat affect and depressed mood. (Tr. 441). His initial differential diagnosis was depression, anxiety, and suicidal ideation, with substance abuse and malingering. *Id*. Throughout his stay at St. Anthony's, Plaintiff was noted to be calm, pleasant, cooperative, and well-oriented. (Tr. 435-451). At discharge on October 4, 2017, he was noted to have only "moderate" symptoms and was alert and well oriented with good judgment and insight, and was stable with no more suicidal ideation, normal mood and intellect, and appropriate affect. (Tr. 436-39). The discharging doctor noted that Plaintiff was a patient who seems to go "from hospital to hospital, [and] never settles down, [n]ever compl[ies] with treatment." (Tr. 435).

Treatment records from Plaintiff's counselors and doctors after his hospitalizations are largely unremarkable. For example, while treatment notes indicate that Plaintiff continued to experience depression and anxiety, his records frequently note that he was well-oriented with normal and appropriate concentration, memory and language, as well as logical and goal-directed flow of thought, and that he was well-groomed with a calm demeanor and no delusions or hallucinations. (Tr. 489, 493, 535, 539, 541, 543). They also note that his medications and therapies seem to be helping. (Tr. 493, 494, 539, 541, 542). Additionally, when his symptoms of anxiety or depression worsened, it often seemed to be situational, in response to stressful external factors such as his poor relationship with his daughter, having to surrender his vehicle for non-payment, and living in homeless shelters. (Tr. 490, 493, 537)

The Court concludes that the ALJ did not err when he concluded that Dr. Gowda's opinion was not supported by or consistent with the evidence as a whole, and thus unpersuasive. In pointing out that the treatment records from Dr. Gowda and other treatment providers did not support the limitations he included in his opinion, the ALJ appropriately focused his analysis on

15

considerations of supportability and consistency, which are the central factors under the new regulations.  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative findings to be"). The Court finds the ALJ's consideration of Dr. Gowda's opinion evidence to be consistent with and supported by the evidence of record.

The Court acknowledges that the record contains conflicting evidence, and the ALJ could have reached a different conclusion with regard to Dr. Gowda's opinion.  But "it is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Renstrom*, 680 F.3d at 1065 (quoting *Pearsall*, 274 F.3d at 1219).  This Court's task is not to reweigh the evidence presented to the ALJ.  The ALJ's weighing of the evidence here fell within the available "zone of choice," and the Court cannot disturb that decision merely because it might have reached a different conclusion.  *See Buckner*, 646 F.3d at 556.

## VI. CONCLUSION

Having reviewed the entire record, the Court finds that the ALJ reasonably relied on the VE's testimony about the number of jobs a person with Plaintiff's RFC could perform.  The Court also finds that the ALJ's consideration of Dr. Gowda's opinion to be consistent with and supported by the evidence of record.  Consequently, for all of the foregoing reasons, the Court determines that the ALJ's decision is supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Acting Commissioner of Social Security is **AFFIRMED**.

Dated this 27th day of September, 2021.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE